UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Case No. 19-CR-20836
Hon. Mark A. Goldsmith

v.

SHADY AWAD,

Defendant.

_____/

### SENTENCING MEMORANDUM ON BEHALF OF SHADY AWAD

On September 18th, Defendant Shady Awad will be sentenced for the offense to which he pled guilty on October 22, 2021, specifically conspiracy to commit bribery concerning programs receiving federal funds under 18 U.S.C. §§ 371 and 666(a). The probation department calculated the guideline range as 30 – 37 months. The Government filed a 5k1.1 motion due to Mr. Awad's substantial cooperation and assistance with its investigation. Taking these considerations and others discussed herein into account, Mr. Awad respectfully urges that a sentence of probation, with appropriate terms and conditions specific to Mr. Awad's situation, satisfies the 18 U.S.C. § 3553(a) factors. If the Court believes that a custodial sentence is required, it is respectfully requested that a period of home confinement be included, with allowance for Mr. Awad to be allowed to continue

operating his business, thereby saving the jobs of his employees.  Alternatively, counsel would respectfully urge that Mr. Awad be sentenced to one day imprisonment, with credit for time served, followed by a term of supervised release.  Mr. Awad has, for all intents and purposes, been under Court supervision for nearly five years, and has lived up to all the terms throughout that time.  Either of the suggested sentences strike an appropriate balance between the individualized considerations related to Mr. Awad and his role in the offense and the purposes of punishment articulated in 18 U.S.C. § 3553(a).

## I.   BACKGROUND

### A.  Personal Background

The presentence report provides a very thorough personal background of Mr. Awad, so we will not go into much detail here. Mr. Awad is currently 44 years old and is a resident of Allen Park.  He and his wife Linda Migally were married on July 31, 2011.  They have two children, aged eleven and nine.  Mr. Awad graduated from Melvindale High School in 1998 and then attended the University of Michigan Dearborn for both his undergraduate and graduate degrees.  He earned a Bachelor of Science in computer engineering in April 2002, and a Master of Science in engineering in August 2009.

After completing his studies, Mr. Awad worked for Bosch as a senior design engineer.  He worked in this role for five years from 2011 until 2016.  In August

2015, Mr. Awad formed Realty Transition.  His role at Realty Transition was acquiring properties throughout Wayne County, managing their renovations, and then selling them.  Realty Transition first started doing this for private properties, but then shifted to doing this under contracts with eight cities and Wayne County for their Right of First Refusal ("ROFR") programs.  Realty Transition is now named NuHome Property Management and Mr. Awad's role is managing rental properties. The company currently has four office employees and ten employees that work in the field.

### B. Offense Overview

From the Fall of 2016 until February 2019, Mr. Awad provided things of value to Mayor of Taylor Richard Sollars, and in return received preferential treatment in the City's programs.  This was a violation of 18 U.S.C. §§ 371 and 666(a).

### C. Legal Proceedings

On December 18, 2019, Mr. Awad and two others were charged in an Indictment filed under seal.  On December 19, 2019, the Indictment was unsealed. That same day, Mr. Awad was arraigned, entered a plea of not guilty, and was released on an unsecured bond.  On October 22, 2021, Mr. Awad pled guilty pursuant to a Rule 11 Plea Agreement.  The Court accepted the guilty plea and took the Rule 11 Plea Agreement under advisement.

## II. COOPERATION

Mr. Awad has been cooperating with the government in this investigation (and others) for several years.  He was first interviewed by the Government in October 2020 and has been interviewed numerous additional times since then.  During these interviews Mr.  Awad consistently expressed sincere remorse for his conduct and provided the Government with important information and documents that substantially assisted their investigations.  There is no question that Mr. Awad's cooperation directly led to other defendants accepting plea deals both in this case and others.  Additionally, Mr. Awad testified on the Government's behalf in the recent evidentiary hearing before this Court relating to the bribe amounts which would be attributed to Mr. Sollars for sentencing.  As a result of Mr. Awad's substantial cooperation, the Government filed a 5k1.1 Motion on his behalf.

## III.      DISCUSSION OF SENTENCING FACTORS

18 U.S.C. § 3553(a) requires that the Court shall impose a sentence "sufficient, but not greater than necessary," and provides several factors that the Court must consider in making this determination.

### A. 18 U.S.C. § 3553(a)(3): The kinds of sentences available

While "the kinds of sentences available" is the third factor that must be considered under 18 U.S.C. § 3553(a), it provides a better starting point for the sentencing discussion for Mr. Awad.  Mr. Awad pled guilty On October 22, 2021,

pursuant to a Rule 11 Plea Agreement and his guideline ranged as calculated by the Probation Department is 30 – 37 months.  Because there is no statutory mandatory minimum and the guideline range is merely the starting point, *Gall v. United States*, 552 U.S. 38, 49 (2007), the Court may sentence Mr. Awad to a lesser term as requested herein.  Either of the suggested sentences appropriately account for Mr. Awad's wrongdoing and comport with the myriad of sentencing considerations as well as taking into account Mr. Awad's substantial assistance to the Government.

### B. 18 U.S.C. § 3553(a)(1): The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

In passing sentence, the Court is to consider "the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  This is because "the punishment should fit the offender and not merely the crime."  *Williams v. New York*, 337 US. 241, 247 (1949).  Of course, crimes do not get sentenced, people do.  Mr. Awad is 44 years old, a husband, and a father of two young children.  He has no prior criminal history.

Mr. Awad worked as an engineer before he made the transition into real estate. He made this career change because he had a great desire to improve the quality of housing in Wayne County and unquestionably, he did.  Prior to 2015, he and a small group of others periodically bid at the Wayne County auction to acquire foreclosed homes.  They purchased and renovated over 70 homes, primarily converting them into rental income properties, although some were sold.  In 2015 the real estate market began improving, and other developers, including those from out of state,

drove up the auction prices.  Mr. Awad wanted to stop the practice of these out of state developers buying numerous homes at the County auction, making hardly any real improvements to them, and then renting them out.  Mr. Awad was not in the real estate business to make a "quick and easy buck" and his company, and contractors did not operate that way.  Instead, they used quality materials in their renovations and made sure to significantly improve the homes, including even when Mr. Awad knew the company was going to lose money on a property.  This was true for the homes which Realty Transition renovated under the ROFR programs as well.  Realty Transition rehabbed houses in Taylor, Ecorse, Melvindale, Allen Park, Romulus, and Wyandotte.  Mr. Awad was willing to tackle even the most rundown properties as he wanted to make the most positive impact on the communities.  Officials and employees from these cities wrote letters to the Court in support of Mr. Awad and they are attached as Exhibit A.

The Mayor of Ecorse, Lamar Tidwell, wrote in his letter to the Court,

"Mr. Awad stated that he was going to make a difference in our community and he did.  Everything the building department told him he needed to do he did.  We had other investment companies pick any properties from a list of 80 foreclosed homes and selected the roughly 5 premium homes from us under the first right of refusal and they all left the city and did not complete the homes.  While RT bought 22 homes on the demo list.  No one has come close to what Realty Transition has done in the community.  Realty Transition went into those homes and totally gutted out the properties putting in new kitchens, new granite counter tops, new bathrooms, new furnaces, new electrical, new roofs, new windows, and their work was outstanding.  Furthermore, we had citizens living in some of the properties and had

nowhere to go and he worked with them to keep them in their homes for whatever they could afford.  Mr. Awad gave them deposits on new homes, hired moving companies to help them and did not evict one person during the entire program."

Brad Burns, who worked in the building department for the City of Melvindale wrote,

"Mr. Awad and his team at Realty Transition partnered with the city of Melvindale beginning in 2017 to help improve the community by addressing these blight concerns.  During the time Mr. Awad worked with the city of Melvindale, he consistently demonstrated professional behavior and upstanding character.  The rehabilitation of many run-down, blight properties throughout the city of Melvindale has helped raise property values significantly."

Jesse Harrington, the Director of Building/Safety for Taylor, wrote,

"I personally received many calls from tenants and residents commending Mr. Awad's work and professionalism.  Mr. Awad has not evicted one person during this program. . Mr. Awad never let cost prevent him from fully rehabbing these blighted homes.  He repaired things right away no matter what the cost."

Angela Croft, a councilwoman for the City of Taylor, wrote,

"Numerous residents have attended City Council meetings to thank the City Council and the Administration for getting these vacant, eyesore properties to homes again and restoring their neighborhood.  I personally toured several homes before and after the rehabilitations took place and they were done very well, and the neighbors always had good things to say about the company and its workers."

At the evidentiary hearing before the Court, Karl Ziomek, the communications director for the City of Taylor, testified that:

"Shady was a very, very hard worker.  He had, from what I understand he had a tremendous amount of money from his family.  He was trying

to I think make good for himself and his family.  He wanted to do the right thing.  I think as far as this program went, I thought the program was borderline outstanding, in its performance. I think Shady did really good work. It Shady had a drawback, it was probably that he was trying to please too many people and may have overstepped his bounds in doing that." (ECF No. 129, PageID.1476, 6-14).

Some "before and after" pictures of the homes that Mr. Awad and his company renovated in the City of Taylor are attached as Exhibit B.  As the Court can see, the properties were greatly improved.  This helped to substantially raise the fair market value in the City of Taylor and the other cities as well.

Mr. Awad helped make a positive impact on the communities discussed above, and he also personally helped many of his employees, contractors, and friends.  As the Court will see in the letters submitted on his behalf (attached as Exhibit C), Mr. Awad really cares about his workers and friends, and is extremely generous to them.  Michelle Wright, one of his workers, wrote, "There was a point I didn't know how I was going to make it being a single mother.  Shady helped with a few things like a truck to get back and forth to jobs and also pay for gas as well. One thing I've learned Shady always is offering a lending hand when people are in need."  Another of his workers, Luke Wydo, was laid off from his previous job and was having a hard time finding work before Mr. Awad hired him.  Mr. Wydo wrote that he purchased a home and "Shady gave me a housewarming gift by painting the entire house and putting brand new wood flooring in.  My wife and I who were financially burdened with buying the new house, were so grateful to Shady for his

generosity."  Derek Vance Sanders wrote that he was "basically homeless and on drugs.  Shady took me in like a family member and kept me working and made sure I had a place to live, food to eat, and was clean and sober.  He even bought me a work truck I badly needed as mine was always broken down."  Mr. Sanders went on to become a foreman.  "Shady will give you the shirt off his back.  I can honestly say he saved me."

Several of Mr. Awad's employees and friends shared their thoughts of Mr. Awad via video interviews (submitted as Exhibit D; Transcript Exhibit E).  A few highlights of those interviews are: "You're not only a boss, but you're a friend, you helped me in so many ways.  Help me purchase three (3) trucks, you helped me with repairs to my garage roof. You're in the process of helping me with my house roof. You helped me when I was down and out and my hot water tank. There is just so much, I could go on and on." (3:00).  "When I was going to lose my home due to unpaid taxes I talked to Shady, and he took care of it no questions asked." (7:20). "We have a relationship even though he's my employer, I consider him a friend. I know he cares for me. I know he cares about the rest of his employees that works for him so. I just wanted to make this video to let you guys know that not only that he's a wonderful person, but he's made my life the last seven, eight years a whole lot better.  Not only mine but my family as well. So, we appreciate him and I'm gonna say it. We love him. Thank you." (10:35).  Another employee says, "Coming

from a really bad situation I was in. He gave me an opportunity. It's been one of the best opportunities I've had in my life. He really changed me and my family's life for the better." (11:50)

Mr. Awad is very involved in raising his children and helping his aging parents. As his sister wrote in her letter to the Court (attached as Exhibit C),

> "He is always with his two children and my two boys. Shady loves taking all four kids out every weekend on different adventures whether its science museum, water park, jump zone or just downtown to ride bikes. He has had to take on a more dominant and primary caretaker role because his wife suffers from a difficult medical condition. Shady has no problem stepping up and would take them and do whatever he could to help them have a balanced life. What amazes me is that he would also insist on taking my two boys out as well so that all four cousins were always together. When Shady is in Allen Park with his kids he is also available to support me in taking care of our parents. My father is approaching 73 and has had 2 heart procedures and so we are the ones that take him to his appointments and check-ups. He is the one who is maintaining issues with their home when their water sum pump fails or AC stops working. He is a tremendous support to them and to me and I would urge the court to take this into consideration for his sentencing."

While the focus of this case is on the improper benefits Mr. Awad provided to Mayor Sollars, it is important to point out that he also made substantial legitimate financial contributions to help the City of Taylor itself. Between 2015 and 2018, Mr. Awad donated over $150,000 to the City of Taylor which was used to build a movie theater, batting cage, and a splash pad. That money was also used to purchase a massive Christmas tree for the City. **In fact, Mr. Awad contributed more money to the City of Taylor in legitimate donations than he provided to Mr. Sollars in**

**illegitimate payments.**  Mr. Awad also made substantial donations to Melvindale, Ecorse, Allen Park, and Romulus.  In Melvindale Mr. Awad's company did all the construction to re-open the community pool (free of charge).  In Ecorse, Mr. Awad donated all the equipment for a "movies in the park" program, and in Allen Park his company built a roof for the baseball dugouts.  For Romulus, Mr. Awad donated money for the City's fireworks show.

Mr. Awad is extremely remorseful for the actions that led to this case, and he has fully accepted responsibility for them.  As he wrote in his letter to the Court (attached as Exhibit F), "I am sorry for my actions that led to me being charged in this case.  I wish I could go back and do things differently, but, of course, I cannot."  §3553(a)(1) provides that the Court must consider "the nature and circumstances of the offense."  In multi-defendant cases such as this, courts "must sentence each defendant separately.   Though it should of course avoid disparities among defendants of equal culpability, the court must come to an independent determination of the appropriate punishment for each defendant[.]" *United States v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013), *as corrected* (July 24, 2013) (citing 18 U.S.C. § 3553(c)).  Gauging Mr. Awad's culpability is a necessary predicate to crafting an appropriate sentence, making it imperative to examine Mr. Awad's actions within the context of the entire offense.  This includes an individualized

assessment of his conduct as well as the circumstances relating to the commission of the offense.

In 2015, the City of Taylor was going to start a Right of First Refusal ("ROFR") Program.  Under the Program, Taylor would exercise its right of first refusal to acquire its tax-foreclosed properties from the Wayne County Treasurer's Office.  The City planned to select one or more developers to acquire, redevelop, and resell these properties.  Several city officials were impressed by the work that Mr. Awad and Realty Transition had done previously on homes in Taylor, and they invited him and another development company to make presentations to a committee to be awarded the ROFR properties.  The other company only wanted the highest valued properties that required the least amount of work.  Mr. Awad on the other hand was willing to take on all the properties, including the most rundown homes. Mr. Awad impressed the committee so much that he and his company were awarded all 95 of the ROFR properties.  **It is crucial to understand that Mr. Awad was awarded all the properties for the 2015 ROFR program before he provided anything of value to Rick Sollars or any other city of Taylor official.**  Mr. Baum confirmed this at the evidentiary hearing when discussing the first year of the Program (ECF No. 128, PageID. 1287, Lines 8-10)

Q. "So there was no kind of quid pro quo, no bribery there, correct?"

A. "Initially there was no bribery at all."

Realty Transition spent over a million dollars in the first year of the Program in Taylor for renovations, taxes, permits, administrative fees, and ordinance violations, for these 95 properties. They put in expensive upgrades even though Mr. Awad knew they were likely going to lose money, at least in the short term, as a result. His plan was to raise the property values in the City by renovating and selling these beautifully rehabbed homes. He would then recoup his money through future sales of ROFR properties over the next several years.

Realty Transition experienced many issues during the first year of the program, including failed inspections and ordinance violations, many of which were undeserved. Mr. Awad had spent over $1M the first year and had not made $1 back. At first Mr. Awad met with Jeff Baum, the Manager of Community Development, regarding these issues, but it did not help. Mr. Awad then began to meet with Mayor Sollars in early 2016. It was not until the middle of 2016 when Mr. Sollars made his first "ask" of Mr. Awad, and it started out innocently enough. Mayor Sollars asked Mr. Awad if he could recommend a contractor to install hardwood floors in Sollars' house. Awad recommended a contractor, but that work did not take place until a few months later. Shortly after his first request, Sollars asked Awad if he could recommend someone to fix a broken window in his basement. Awad set Sollars up with a contractor who went to the house. However, there was no broken window.

Sollars made this up.  Instead Sollars requested a sliding door which cost $1900.   In early August 2016 the contractor Awad had recommended completed the hardwood floors for Sollars.  Other contractors Awad recommended had also performed several other jobs around this same time period.  During these initial months, Awad believed that Sollars was going to pay for all the work which had been completed and prepared invoices.

On August 16, 2016, the City Council unanimously approved Realty Transition be awarded 29 of the 34 properties for the 2016 ROFR program.  **Realty Transition was awarded both the 2015 and 2016 ROFR contracts before Mr. Awad provided anything of substantial value to Mayor Sollars or Jeff Baum.**

Sollars continued to ask Awad for contractors to perform work at his properties.  Awad hoped that Sollars would pay for this work, but no payment was ever made.  Sollars claimed that he was going to sell his house one day, and that once he sold it, he would pay Awad for the work that had been done.  Sollars even showed Awad the lot he planned to buy once he sold his house.  As Awad continued to have his contractors do additional work for Sollars with no payments from him, he realized that Sollars was never going to pay for the work that had been done or for any of the future work that he would come to demand.

Sollars continued to ask Awad for work to be done at his properties, and even though Awad now knew he was not going to be paid for it, he felt that he had no

other choice but to comply.  Awad knew it was wrong to be providing free services to Sollars.  As if the free services / work were not enough, Sollars then began asking Awad to purchase items for him and even provide him with cash.  Awad complied with these requests as well.  When they were on a trip together in Las Vegas in October 2017, Mr. Sollars asked Awad for a "loan" to gamble with.  Awad told him that he could lend him $500, but Sollars replied asking him for even more money.  Awad gave him the cash even though they both well knew Sollars was never going to pay what Sollars conveniently labeled as a "loan" back.  On another occasion Sollars asked Awad to drive him to the airport for one of his (Sollars') trips to Las Vegas and on the way asked Awad for cash. Awad tried to avoid giving it to him by intentionally putting in the wrong PIN number at the ATM and claiming that his card was not working.  Undeterred, Sollars told him they should go to Dominic's Market (run by defendant Altoon), and they could run his card and give him cash.  Awad was frustrated but complied.

The obvious question is why did Mr. Awad do these things?  Unfortunately, Mr. Awad felt like he could not say "no" to Sollars' requests for several reasons.  First, by this time Mr. Awad believed that Sollars controlled everything that happened in the City of Taylor.  The majority of the ordinance violations, failed inspections, and other issues had largely been resolved satisfactorily.  Though Mr. Awad now knows that many of these were artificially manufactured by Sollars, Mr.

Awad believed at the time that these barriers were removed due to the benefits he was providing to Sollars.  As such, Awad believed that if he ever were to say "No" to Sollars never ending "requests", these artificially created failed inspections and violations would only increase in their frequency.

Mr. Awad had also learned that even though it was the City Council who awarded properties under the ROFR contracts, Sollars could personally divert them (after they were awarded) to a different developer if he chose.  Awad had seen this happen first-hand.  In 2017, another developer was awarded several properties under the program, but complained to Sollars that he should have been awarded more. Sollars responded by forcing the developer to transfer two of the homes he had been awarded to Realty Transition with the supposed reason being that the other developer was doing poor quality work.  Another city official told Awad that the true reason was because the other developer had dared to question and complain to Sollars. Sollars often threatened to (and later did) take away ROFR properties from Realty Transition or even to cancel Realty Transition's contract all together.  This would have been devastating to Awad and his business.

Awad had already invested well over a million dollars into the City of Taylor. His plan was to help raise the property values in the city, and then over time he would get his money back (and hopefully make a profit) through later sales.  However, he needed to continue to get ROFR properties in order to do so.  There were generally

only a few ROFR properties each year that generated a profit, and Awad needed to receive those properties to start making his money back.  Realty Transition was awarded 29 of the 34 ROFR properties for 2016 and 38 of the 45 properties in 2017. However, the seven properties it did not receive in 2017 were valuable ones.  This was no mistake.  It was part of Sollars ongoing plan to exercise control over Mr. Awad and his company, Realty Transition.

After the award of the 2018 Taylor ROFR program, the City of Taylor acquired 37 tax-foreclosed properties from the Wayne County Treasurer using funds provided by Realty Transition as required by its contract with the City.  All 37 properties were then deeded to Realty Transition by the City.  Shortly thereafter, Sollars demanded additional benefits.  At this time, Mr. Awad tried to at least slow down the frequency of Mr. Sollars' seemingly never-ending demands.  Awad told Sollars that he would have to wait as Awad could not afford it since he had just paid the City for the properties and was starting his crews on the rehab work for them.  In response, Sollars decided to institute a new "mentor program" for the ROFR program to promote more "community involvement" and to use the program to assist in the development of more local businesses.  Realty Transition was forced to transfer 13 (out of the total 37) of the best properties it had been awarded to other "developers" chosen by Sollars and his administration.[1]  The local "developers"

---

[1] RT was reimbursed its acquisition costs.

chosen had little, if any, renovation experience and were not approved by the City's original selection committee; they were friends and business associates of Sollars. Nine properties were reassigned to Taylor South Investment LLC, a Michigan limited liability company owned by Defendant Hadir Altoon. Two properties were reassigned to a company owned by a close friend of Sollars, and two properties were reassigned to a company owned by a hotel owner and close business associate of Sollars. Awad received Sollars' message loud and clear – if you dare to push back on my demands, consequences will follow. By having the audacity to say no to Sollars (and the "no" was only a temporary/delay tactic), Awad lost 35% (13/37) of the 2018 properties awarded to him; and the best ones at that.

None of these "developers" requested Realty Transition to provide any "mentoring", and no "mentoring" took place. Realty Transition was not involved in any of their renovations. These property transfers likely cost Realty Transition well over a million dollars in profits as these properties included two commercial properties and most of the best tax-foreclosed homes for 2018. This "mentor" program and the accompanying loss of valuable properties were the result of Awad telling Sollars that he could not provide benefits to him immediately. In fact, Sollars used it to punish Awad and reward his friends and business associates with valuable properties. This situation again made Mr. Awad realize what would happen if he said "no" to Sollars.

Mr. Awad and Realty Transition were working on ROFR programs in other cities as well, and on several occasions Sollars threatened that he could get Awad "blacklisted" throughout Wayne County. Sollars had written letters of recommendation for Awad which presumably had helped him obtain properties in these cities, and Awad believed that Sollars had the ability to follow through on this threat. Thus, not only did Awad believe that Sollars could cause him substantial financial harm within the City of Taylor, but he felt that Sollars could do the same in other communities across the state of Michigan in which he was operating.

Importantly, while most bribery cases begin with a bribe in order to obtain something, that was not the case here. Indeed, the opposite was true. Mr. Awad obtained the 2015 and 2016 ROFR properties before he provided anything of value to any city official. He had spent over a million dollars on the Program in the first year. Numerous issues and roadblocks mostly created by city officials – at Sollars behest and direction – played a large part in that. Mr. Awad attempted to befriend Mayor Sollars and Jeff Baum to help resolve those manufactured issues. That quickly turned into Sollars taking advantage of Awad and making demands of him. Awad complied with those demands because he believed he could not refuse Sollars for the reasons discussed above.

To be clear, that is not to say that Mr. Awad is innocent here. Mr. Awad knew what he was doing was wrong, and he did it anyway. He hoped to and did receive

preferential treatment in the city's programs as a result of the improper benefits he provided to Sollars.  However, the context is critical to understand here.  For all these reasons Mr. Awad pled guilty and has accepted responsibility for his actions in this case.

### C.  18 U.S.C. § 3553(a)(2)(A): The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, To Promote Respect for the Law, & to Provide Just Punishment for the Offense

As was acknowledged at the outset, these are serious offenses.  Punishment will be (and has been) meted out… But this provision of § 3553 speaks of "just" punishment.  This Honorable Court has for many years in its experience in State and Federal court heard often that "Defendant has already been punished enough," in this case, there can be no doubt that Mr. Awad already has been punished a lot.  He was charged over four years ago.  Even his guilty plea was more than 2.5 years ago.  He has been reporting to pre-trial services for almost five years now, and he has had this case hanging over his head the entire time.  Mr. Awad has, for all intents and purposes, been on "probation" with absolutely no problems for over four years.  To be sure, it has been a very heavy burden to carry, and it has taken an emotional toll on both him and his family.

As a result of Mr. Awad's conviction, he will most certainly not be able to participate in ROFR programs in the future.  His real estate license has been revoked.  This is an unfortunate reality because the fact remains that Mr. Awad initially

became involved in these programs for all the "right" reasons, and by all accounts Mr. Awad and his company and crews did outstanding work on these homes and greatly helped these Wayne County cities as a result.  Losing the ability to do this important work is devastating to Mr. Awad.  As he wrote in his letter to the Court,

> "one of my biggest regrets is that I will not be able to fully complete my work improving additional homes in these cities.  I promised to improve these neighborhoods through the Program, and the residents supported and embraced it.  It was on its way to being very successful. Now the Program has been stopped and it will not have accomplished everything that it could have.  I feel that I let those residents and communities down because of this."

Mr. Awad also has been sued in five lawsuits directly related to this case which also has resulted in substantial legal fees and will continue to do so.

Part of the punishment Mr. Awad has undergone here flows from, at least in part, his cooperation with the Government.  As the Court is aware, Mr. Awad testified at length over two days at an evidentiary hearing to determine the loss/gain amount to be attributed to Mayor Sollars.  He answered every question asked of him, admitted his wrongdoing, and responded to personally humiliating questions put to him by Sollars' counsel.  His testimony served as the primary basis for the Court's findings of fact concerning things of value received by Mr. Sollars.  Mr. Awad's family was subjected to hearing (and seeing) personally humiliating things about Mr. Awad.  In Mr. Awad's mind, this is yet another example of what happens to someone who dares to go against Rick Sollars by his cooperation and substantial

assistance to the government.  The impact of that public humiliation will be felt not only by Mr. Awad, but his family for the rest of their lives.  That was/is not punishment by the Government – but punishment it is – severe punishment as a result of doing the **right** thing, by assisting the Government.

### D.   18 U.S.C. § 3553(a)(2)(B): The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct

To the extent that general deterrence is a recognized purpose of sentencing, it necessarily involves a "sufficient but <u>not</u> greater than necessary" analysis.  That is particularly the case when trying to predict what punishment of one person is appropriate to deter a different person from committing a similar offense in the future.  While a recognized proper purpose of sentencing, that entire concept has serious limitation when one looks at the conduct of those who are well aware of the serious consequences that are visited upon those who have done similar things, but who are not deterred by such knowledge.  For example, is the fact that prior offender "A" was sentenced to a "mere" two years for an offense rather than five years the reason that offender "B" was not deterred?  Neither common sense nor experience suggest that to be correct.

To bring this point to bear upon this case, Mr. Awad potentially faces a guideline range of 30-37 months imprisonment for his involvement in this conspiracy.  Will that serve to deter others similarly situated from committing such an offense in the future?  Would a sentence of twelve months?  Or would we need a

sentence of twenty-four months, or . . . ?  Mr. Awad's plight has been widely publicized; his life has been turned inside out; he potentially faces a custodial sentence; he has paid huge legal fees; he has been named in a civil RICO suit; the personal toll on him and his family is devastating; his employability has been severely hampered if not ruined.  All those things happen whether he is sentenced to 15 months in custody, or to probation.

In this case, counsel's requested sentence is "sufficient, but <u>not</u> greater than necessary", to afford adequate deterrence.  Acknowledging that there is no scientific guide to the question of deterrence, much has already been achieved in promoting general deterrence in this case.  By indicting Mr. Awad and others in this case, the federal government made its intent to vigorously prosecute public corruption cases crystal clear.  Any deterrent message was sent and received well before formal imposition of this Court's sentence on Mr. Awad.   As the Supreme Court acknowledged in *Gall*, "[o]ffenders on probation are . . . subject to several standard conditions that substantially restrict their liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007).  Additionally, as the Court in *United States v. Musgrave*, 647 F. App'x 529, 533 (6th Cir. 2016) (*Musgrave II*) concluded, non-custodial sentences do promote general deterrence, particularly home confinement when combined with a fine as the Court imposed in that case.

What Mr. Awad has gone through over these past five years and will continue to go through whether or not a custodial sentence is imposed, is more than sufficient deterrence.  To be very colloquial: "It has been awful" and this sentencing memo merely scratches the surface of what he has had to endure over these past several years, much of it caused by his own actions.

### E. 18 U.S.C. § 3553(a)(2)(C): The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant

Regarding specific deterrence, there is no risk that Mr. Awad will commit crimes in the future.  Other than the offense to which he has pled guilty here, Mr. Awad has an unblemished criminal record.  He has accepted responsibility for his actions and expressed his sincere remorse for the poor choices that have brought him before the Court.

Mr. Awad has had no prior contact with the criminal justice system, and is therefore, among the class of defendants least likely to reoffend.  *See* U.S. Sent'g Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* (March 2017) (multi-year empirical study concluding that defendants with zero criminal history points *and* no prior contacts with criminal justice system are statistically less likely to recidivate than defendants with zero criminal history points but some prior contact with criminal justice system).

### F. 3553(a)(2)(d): To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or other Correctional Treatment in the most effective manner.

24

As the Court knows from the PSR, Mr. Awad has both physical and mental health issues. He is in constant contact with numerous professionals for treatment of these issues. While some of these issues are likely able to be treated in a custodial facility, there is no question that Mr. Awad would be better served by continuing to see his current doctors and health care providers as he has for years. Mr. Awad's wife also suffers from a serious medical condition, and this is discussed in more detail in in the PSR.

### G. 18 U.S.C. § 3553(a)(6): The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

Four people have been charged in this case and all have pled guilty. According to the terms of their plea agreements, their maximum custodial sentences are as follows:

Richard Sollars: a sentence to not exceed 71 months.

Jeffrey Baum: a guideline range of 46 to 57 months with a sentence to not exceed the top of the guideline range.

Hadir Altoon: a guideline range of 27 to 33 months with a sentence to not exceed the top of the guideline range.

Mr. Awad's guideline range is 30 – 37 months which is based on an offense level of 19 and a criminal history category of I. As the PSR provided, during the

last five fiscal years (2019-2023), there were sixty defendants similarly situated. Eight of those defendants received no imprisonment. For the fifty-two defendants who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 19 months, and the median length of imprisonment imposed was 19 months. However, these sentences were for defendants who did NOT receive a 5k1.1 substantial assistance departure as the government has requested for Mr. Awad. That crucial difference strongly supports Mr. Awad's sentence being much lower than 19 months, and further supports counsel's suggested sentence.

## IV.    Fine

The parties did not agree to a fine as part of their plea agreement. The fine range for this offense is from $10,000 to $100,000. Due to all of the circumstances discussed above, counsel would recommend a fine of $10,000.

## V.    CONCLUSION

Under 18 U.S.C. § 3553, taking all of the factors into consideration, and the particular facts of this case with Mr. Awad's circumstances, it is respectfully urged that a sentence of probation, with appropriate terms and conditions specific to Mr. Awad's situation, be imposed. If the Court believes that a custodial sentence is required, it is respectfully suggested that a period of home confinement be included, with allowance for Mr. Awad to be allowed to continue operating his business,

thereby saving the jobs of his employees.  Alternatively, counsel would respectfully urge that Mr. Awad be sentenced to one day imprisonment, with credit for time served, followed by a term of supervised release.   Mr. Awad has, for all intents and purposes, been under Court supervision for nearly five years, and has lived up to all the terms throughout that time.  Either of these sentences would be "sufficient, but not greater than necessary," and would allow Mr. Awad to continue to run his company and provide jobs to his employees, take care of his young children, and continue to receive important medical treatment from his healthcare professionals.

Respectfully submitted,

Butzel Long

Dated: September 11, 2024          */S/ David F. DuMouchel*
DAVID F. DuMOUCHEL (P25658)
GEORGE DONNINI (P66793)
DAMIEN P. DuMOUCHEL (P74188)
201 W. Big Beaver Road
Troy, MI 48084
(248) 258-1616
dumouchd@butzel.com
donnini@butzel.com
dumoucheld@butzel.com
*Attorneys for Shady Awad*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.   There are no unrepresented parties upon whom traditional service is required.

Respectfully submitted,

Dated: September 11, 2024          */S/ David F. DuMouchel*
DAVID F. DuMOUCHEL (P25658)